STATE, Respondent, v. BEATY, Appellant.

*No. State 38. Argued January 31, 1973.—Decided March 13, 1973.*
(Also reported in 205 N. W. 2d 11.)

532

For the appellant there was a brief by *Lloyd L. Chambers* and *Chambers, Nash, Pierce & Podvin,* all of Wisconsin Rapids, and oral argument by *Lloyd L. Chambers.*

For the respondent the cause was argued by *James P. Altman,* assistant attorney general, with whom on the brief was *Robert W. Warren,* attorney general.

ROBERT W. HANSEN, J. We find no errors at all in the trial that led to the conviction of the defendant on a charge of burglary, and no fault with the sentence imposed. However, each claim of error, all thoroughly briefed and ably presented, will be separately discussed.

*Information.* Defendant claims that the information filed failed to apprise him of the charge brought against him. The information filed charged that the defendant did:

"Intentionally enter a building or dwelling without the consent of the person in lawful possession and with the intent to steal or commit a felony therein, to-wit: Said defendant did intentionally enter the West Junior High School, located in the City of Wisconsin Rapids, without the consent of Calvin Hagen, Principal of said school and the person in lawful possession, and with the intent to seal or commit a felony therein *when said defendant did in fact steal a little over $200.00 from the desk of the Assistant Principal, Ray Lecy, without the consent of said Mr. Lecy."* (Emphasis supplied.)

We see no basis for the claim that the defendant was not quite precisely informed of the charge being brought against him. The italicized portion of the information gives no room for the confusion as to what the defendant was being charged with having done that this court

found in a recent case.[1] Nor was there any element of confusion introduced in the verdict and instructions. The trial court instructed the jury that the defendant was charged only with burglary with intent to steal, stating that the third essential element of the crime with which the defendant was charged was "that the defendant entered such building with intent to steal." If defect there were, and we find none in the information, it would fall within sec. 971.26, Stats., providing:

". . . No indictment, information, complaint or warrant shall be invalid, nor shall the trial, judgment or other proceedings be affected by reason of any defect or imperfection in matters of form which do not prejudice the defendant."

*Stop-and-frisk.* Defendant claims that evidence secured when he was frisked for weapons was inadmissible. Plaintiff's brief suggests, somewhat ambivalently,[2] that the checking for weapons occurred after he had been handcuffed. However, the trial court was entitled to believe the entirely reasonable testimony of the officer who did the frisking that he ". . . stepped out . . . told him to get the other arm up, and I padded him down." The officer testified that, after he had felt the bulges and searched the coat pockets, he told the defendant he was being arrested for breaking and entering.

However, a person can be under arrest before a police officer tells him that he is. Here two police officers, one with revolver drawn, confronted the defendant, told him to raise his arms, patted his coat pockets to determine if he was armed and dangerous. Was he under arrest when they did such stopping and frisking? The court has said:

---

[1] *See: Champlain v. State* (1972), 53 Wis. 2d 751, 193 N. W. 2d 868.

[2] In its statement of facts, defendant's brief states: "Defendant's hands were over his head *and* handcuffed behind his back as the search began." (Emphasis supplied.)

" '. . . The central idea of an arrest is the taking or detaining of a person by word or action in custody so as to subject his liberty to the actual control and will of the person making the arrest. . . . But there must exist the intent to take into custody and a corresponding understanding by the person arrested that he is in "custody," although no formal declaration of arrest is required.' " [3]

When the two police officers stopped the defendant, they clearly placed his liberty, at least to keep on walking, under their will and control. But did they intend and did he understand that he was then and thus being placed in custody to be taken to the police station on a charge of having violated a criminal statute?

The United States Supreme Court has distinguished arrest from stopping to question a suspect,[4] terming arrest "a wholly different kind of intrusion upon individual freedom than a limited search for weapons," [5] with the "interests each is designed to serve . . . likewise quite different." [6] An arrest, the high court stated, is "inevitably accompanied by *future interference* with the individual's freedom of movement, whether or not trial or conviction ultimately follows." (Emphasis supplied.) [7] Obviously, stopping a suspect to question him—and to frisk him for weapons—does not involve such certainty of continued or future restraint. It may, but not necessarily so.

On the matter of stopping to question versus arrest, the *Terry Case* refers to a leading text where the author states:

---

[3] *State v. Doyle* (1968), 40 Wis. 2d 461, 468, 162 N. W. 2d 60, citing and quoting from *Huebner v. State* (1967), 33 Wis. 2d 505, 516, 147 N. W. 2d 646.

[4] *Terry v. Ohio* (1968), 392 U. S. 1, 88 Sup. Ct. 1868, 20 L. Ed. 2d 889.

[5] *Id.* at page 26.

[6] *Id.* at page 26.

[7] *Id.* at page 26.

"Arrest . . . is a distinct operational step in the criminal justice process, involving all police decisions to interfere with the freedom of a person who is suspected of criminal conduct *to the extent of taking him to the police station for some purpose.*

". . . A basic distinction employed in this volume is that between actually taking a suspect to the station *and the preliminary investigative devices of stopping and questioning, frisking, and conducting an on-the-spot search.*" [8] (Emphasis supplied.)

The trial court treated this situation as a stopping for questioning and a frisking for weapons. We agree. At the time they confronted the defendant, the officers did not know that the school had been broken into and burglarized. They did know that the area was one in which there had been a rash of break-ins. They did know the defendant and that he had a previous burglary record. They did know that, in the post-midnight hours, he parked his automobile on the school grounds, after traveling a circuitous route. They did know that on a sub-zero night with snow waist-high, he had been cutting through backyards, peering or peeking around the corner of a house before proceeding. Such suspicion-engendering activities warranted and, in fact, dictated that the defendant be stopped and questioned about his activities. As the United States Supreme Court said in *Terry,* ". . . It would have been poor police work indeed for an officer . . . to have failed to investigate this behavior further." [9]

With the stopping to question clearly proper under these circumstances, was it reasonable, under the same circumstances, for the officers who had stopped the defendant to frisk him for weapons? That is the test. [10]

[8] W. LaFave, *Arrest—The Decision to Take a Suspect into Custody* (1965), page 4 (cited in *Terry v. Ohio, supra,* at page 26).

[9] *Terry v. Ohio, supra,* at page 23.

[10] *State v. Chambers* (1972), 55 Wis. 2d 289, 198 N. W. 2d 377, citing *Adams v. Williams* (1972), 407 U. S. 143, 146, 92 Sup. Ct.

Here it was met. At the time, under the circumstances, knowing the defendant had a burglary record, the protective frisking for weapons was entirely proper. Police officers are not required to take unnecessary risks in the performance of their increasingly hazardous duties.[11] Entitled to frisk for weapons,[12] encountering the unexplained bulky objects in the coat pockets, the officers were entitled to reach into the pockets and empty their contents.[13] The box of loose coins, the bag of rolled coins, the stolen notepaper, it follows were in the posses-

1921, 32 L. Ed. 2d 612, wherein the United States Supreme Court stated: "The Court recognized in *Terry* that the policeman making a reasonable investigatory stop should not be denied the opportunity to protect himself from attack by a hostile suspect. 'When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others,' he may conduct a limited protective search for concealed weapons. 392 U. S., at 24. The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence, and thus the frisk for weapons might be equally necessary and reasonable, whether or not carrying a concealed weapon violated any applicable state law. So long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose. . . ."

[11] ". . . Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded. . . ." *Terry v. Ohio, supra,* at page 23.

[12] *State v. Chambers, supra,* at page 300, the court stating: ". . . It follows that the police officer here, under these circumstances, was entitled to place his hands on the outside of the pockets of the jacket defendant was wearing to determine if either pocket contained a gun or other dangerous weapon."

[13] *Id.* at page 300, the court stating: "Having felt the metal, cylindrically shaped object which the officer believed to be a pistol, knife or zip gun, he was entitled to reach into the pocket and remove it."

sion of the police as the result of an entirely reasonable and constitutionally permissible police procedure.[14] As such, they were properly admissible as evidence in this case.

*Footprints.* Defendant claims error in admitting as evidence a shoe and a plaster cast of a footprint, one of those leading from defendant's car to the burglarized school building. The shoe, identified as "similar" to the one worn by the defendant on the night of the crime, was also identified only as being "similar" to the footprint. (Both were of the same size and each had the same bell-shaped heels.) The identification of the shoe with the footprint was less than positive, but that goes to probative value, not admissibility. All that is required is a reasonably probable identification of evidence having probative value.[15] The evidence was admissible, with the weight to be given it for the trier of fact to determine.

*Surveillance.* Defendant claims error in references to defendant being "under surveillance" by police on the night of the burglary. It is clear from all of the testimony that he was. There was no need to search for a

[14] *Id.* at pages 300, 301, the court stating: "When the hard, cylindrically shaped object developed to be a brass pipe, contained in a plastic bag with leaves chemically identified to be marijuana and a capsule chemically determined to contain a dangerous drug, the pipe, marijuana and vial were properly in police possession as the result of an entirely reasonable and constitutionally permissible police procedure. As such, they were properly admissible as evidence at trial."

[15] *State v. Spring* (1970), 48 Wis. 2d 333, 338, 179 N. W. 2d 841, stating: ". . . There was a reasonably probable identification of evidence having probative value. The identification is not required to be positive, absolute, certain, or wholly unqualified." (Citing 22A C. J. S., *Criminal Law*, page 949, sec. 709.) *See also: United States v. Panczko* (7th Cir. 1965), 353 Fed. 2d 676, 679 (keys admitted into evidence were similar to those given the officer).

synonym for the apparent fact that the police were observing the defendant from the time he left his house until the time of his arrest. The objection is to the word "surveillance" but here that meant no more than that the defendant was under police observation on the occasion of the break-in.

*Sufficiency.* Defendant claims that the evidence is not sufficient to support the conviction. The test is whether the trier of facts, acting reasonably, could have been convinced beyond a reasonable doubt by the evidence which it accepted as true.[16] Here that evidence was circumstantial, as it usually is in burglary cases.[17] But in some situations, as here, circumstantial evidence can be more convincing than direct evidence.[18] Here the defendant was followed to the burglarized school in the early morning hours. Footprints led from defendant's car to a broken outer window of the school. Defendant was arrested a short distance from the school with coins, money and a stolen notepaper from the assistant principal's desk. In another situation, this court said: ". . . Sometimes circumstantial evidence shouts while oral testimony talks. . . ."[19]

To the contention that the presence of another parked car in the area required the state to prove that the burglary was not committed by the driver of the other car, the short and simple response is that the state had the positive duty of proving the defendant committed

[16] *Quinn v. State* (1971), 50 Wis. 2d 96, 99, 183 N. W. 2d 61; *Lock v. State* (1966), 31 Wis. 2d 110, 115, 142 N. W. 2d 183; *Gauthier v. State* (1965), 28 Wis. 2d 412, 416, 137 N. W. 2d 101.

[17] *Harris v. State* (1971), 52 Wis. 2d 703, 707, 191 N. W. 2d 198, the court observing: ". . . In burglary cases the evidence is generally circumstantial . . . ."

[18] *Kopacka v. State* (1964), 22 Wis. 2d 457, 464, 126 N. W. 2d 78.

[19] *Roberts v. State* (1969), 41 Wis. 2d 537, 547, 164 N. W. 2d 525.

the crime as charged, not of proving that someone else did not. Circumstantial evidence is to be inconsistent with any reasonable hypothesis of innocence,[20] but, as this court put it:

". . . 'it is not every possibility that must be removed before a conviction can be sustained, particularly where there is no evidence at all on which to base a reasonable alternative hypothesis as to what happened.' . . ."[21]

*Substitution.* Defendant claims error on the part of the trial court in refusing to grant a motion for substitution of judges. The motion was filed at 4:30 p. m. on March 27, 1972. The trial was scheduled to begin, at defendant's request, at 9 a. m. on March 28, 1972, the following morning. The arraignment had been held on March 7, 1972. Sec. 971.20 (1), Stats., provides that the motion for substitution is to be made prior to arraignment. The motion was not timely, and was properly denied.[22]

It follows from the preceding that, in every particular and against each challenge, the conviction and sentence stand.

*By the Court.*—Judgment affirmed.

[20] *State v. Eberhardt* (1968), 40 Wis. 2d 175, 178, 161 N. W. 2d 287.

[21] *Curl v. State* (1968), 40 Wis. 2d 474, 488, 162 N. W. 2d 77, citing *State v. Eberhardt, supra,* at page 178.

[22] *See: State v. White* (1972), 53 Wis. 2d 549, 554, 193 N. W. 2d 36, stating: ". . . Since the affidavit was not timely presented, the trial court properly refused to honor it." While the reference is to an affidavit of prejudice, this had the same status and result as the motion for substitution of judges under sec. 971.20 (1), Stats., and the same reasoning and result apply.